THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WENDELL BYRON DIXON, Defendant-Appellant.

First District (5th Division)    No. 80-946

Opinion filed March 26, 1982.

Chester Slaughter, of Chicago (Donald Hubert, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Barbara A. Levin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MEJDA delivered the opinion of the court:

Defendant was convicted of two counts of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) in a jury trial and sentenced to a minimum of 30 years and a maximum of 90 years for each count to run concurrently. Defendant appeals.

Defendant raises six issues on appeal: (1) whether the court erred in failing to suppress his confession; (2) whether the State's use of its peremptory jury challenges violated defendant's State constitutional right to an impartial jury; (3) whether defendant was denied the right to confront the witnesses against him; (4) whether the court erred in refusing two of defendant's tendered jury instructions; (5) whether the trial court erroneously denied the jury's request for trial transcripts; and (6) whether defendant was proved guilty beyond a reasonable doubt.

Wendell Dixon (defendant) and John Coleman were tried by separate juries during a joint trial for the murders of Barry Beckwith and Warren Jones. Only Dixon is involved in the instant appeal.

The following pertinent facts were adduced at trial. On Friday, April 30, 1976, the bodies of Beckwith and Jones were discovered in an alley at 8641 South Exchange in Chicago, Illinois. Both died of gunshot wounds. One of the bodies was found inside a 1973 Monte Carlo automobile, and the other was found outside of the car. A fired bullet was found lying on the ground next to the car. Four sets of fingerprints and another bullet were removed from the car's interior. On May 1, 1976, a person washing his car found a gun located underneath a car parked down from his own. Later that day Investigator McCabe picked up the gun. A firearms expert testified that the bullet removed from the ground and a bullet removed from one of the victims were fired from the recovered gun. A fingerprint expert testified that one of the impressions taken from the car belonged to Coleman but that none of the impressions belonged to defendant.

Investigator John McCabe testified that on Saturday, May 1, 1976, he went to the home of John Coleman and took him down to the station for questioning. McCabe also went to defendant's home, but he was not there at the time. Defendant's family testified that at approximately 6 p.m. that evening defendant, accompanied by his parents and older brother, went to the station. The State's witnesses testified that defendant was questioned by police officers for short periods of time at least five times during the evening of May 1, 1976. Both Investigators Russo and McCabe and Assistant State's Attorney Haddad testified that they read defendant

his *Miranda* rights. Defendant was not handcuffed at any time. Defendant denied his involvement in the crime in all but the final interview. Investigator McCabe testified that at approximately 9:30 that evening he had a conversation with Coleman after which McCabe, another investigator, Coleman and Coleman's father left the police station and retrieved a gun, later identified as the murder weapon, from an individual who had found it in the alley under a car. After retrieving the weapon McCabe and Haddad, who again informed defendant of his *Miranda* rights, interviewed defendant. At this time defendant stated that he did in fact shoot Beckwith and Jones; that he and Coleman and another individual named Nixon put up some money to make a marijuana purchase; that there was an attempt or supposed robbery of Beckwith and as a result defendant got neither the marijuana nor his money back. Nixon, Coleman and defendant decided that they were either getting their money or the marijuana, or they would kill Beckwith and Jones. At the time of the murder defendant, Coleman, Beckwith and Jones were in Beckwith's car. They went into an alley at the rear of the 8600 block on Escanaba and argued, and defendant shot Beckwith in the back of the head and then shot Jones as Jones tried to get out of the car. Defendant gave the gun back to Coleman, who hid it underneath a car. McCabe further testified that defendant refused to make a written statement at that time.

William Haddad testified that during the evening of May 1, 1976, and early morning of May 2, 1976, he first spoke with Coleman. After concluding his second conversation with Coleman before a court reporter at 1:45 a.m. on May 2, 1976, he spoke with defendant whose family was with him in the interview room. Haddad advised defendant of his *Miranda* rights and asked defendant if he wished to speak to him about the homicides. Defendant, responding that he did, asked his family to leave the room. Haddad then brought McCabe into the room. Haddad's testimony and that of McCabe as to defendant's confession corroborated each other. Haddad also testified that he wrote a memorandum with regard to defendant's statement which he later gave to his secretary.

In his defense defendant testified that on Friday, April 30, 1976, he attended classes at Fenger High School until 1 p.m., at which time he went to baseball practice. He practiced with his high school team until 5:30 and then left for home where he arrived at 6:30 p.m. After eating dinner he went to a park where he met his girlfriend and other friends. After 30 minutes he went to his girlfriend's house and stayed there until some time after 10 p.m. Around 11:30 p.m. defendant, his girlfriend, several of his friends, including John Coleman, went to a party where they stayed for two hours. Defendant and his friends then left looking for another party which they never found. Defendant testified he arrived home at approximately 3:30 a.m. on Saturday, May 1, 1976.

Defendant also testified to the events which occurred when he was questioned at the police station Saturday evening. In particular he testified that when he spoke with Haddad and McCabe that McCabe asked his parents to leave the room. After they left Haddad advised defendant of his rights. McCabe then asked defendant if he wished to make a statement, but defendant refused. Defendant testified that McCabe also told him that Coleman had made a statement and that they had the pistol. Defendant denied ever making the statement testified to by Haddad and McCabe. Defendant further testified that McCabe told him to just nod his head and say yes and they would let him go. Defendant then nodded his head and McCabe and Haddad left the room. Defendant further testified that he had been questioned about 7 times by the police while at the station and had denied any knowledge about the murder about 15 times. Defendant admitted to having known Beckwith for about 11 years but denied knowing Jones. Defendant testified that he was handcuffed to a wall while at the police station.

Defendant's mother, father and brother testified in defendant's behalf. None offered testimony to corroborate his alibi. Their testimony was limited to events which occurred on May 1, 1976, and May 2, 1976. They testified that on Saturday, May 1, 1976, they arrived at the police station at approximately 6 p.m. Defendant was interviewed at least seven times during the evening and repeatedly denied involvement in the crime during those times when they remained with him when questioned. They testified further that defendant was handcuffed to the wall when questioned. Defendant's father left the station at approximately 1:30 Sunday morning but his mother and brother remained. At about 2:30 a.m. Haddad told the family to leave the interview room. Defendant was still handcuffed. Haddad and McCabe again interviewed defendant. When they came out of the room McCabe stated that defendant had given them a statement but did not tell the family the contents of the statement. Defendant's mother and brother left the station around 4 a.m. Prior to trial defendant made a motion to suppress the alleged confession he made to McCabe and Haddad. Defendant also moved for a mistrial, contending that the State had improperly used its peremptory challenges to exclude black persons from the jury. Both motions were denied. The jury returned a guilty verdict upon which judgment was entered. Defendant appeals.

OPINION

Defendant first contends that his confession was coerced and therefore was improperly admitted into evidence. The test to determine whether a confession is voluntary is whether the accused's will was overborne at the time he confessed, for if such is the case the confession cannot be deemed the product of a rational intellect and a free will.

(*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508.) In making its decision the trial court is not required to be convinced beyond a reasonable doubt that the confession was voluntary. (*People v. Medina* (1978), 71 Ill. 2d 254, 375 N.E.2d 78.) If a trial court finds that a confession is voluntary and has applied the proper legal standard, on review inquiry is limited to whether that finding is against the manifest weight of the evidence. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 117-18, 429 N.E.2d 508, 512; *People v. Brownell* (1980), 79 Ill. 2d 508, 521, 404 N.E.2d 181, 188, *cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59.) That is, an opposite conclusion must be clearly evident. (*Ritter v. Hatteberg* (1957), 14 Ill. App. 2d 548, 145 N.E.2d 119.) Defendant has not challenged the legal standard applied by the trial court, but rather asserts that the totality of the following circumstances surrounding defendant's confession demonstrates its involuntariness: defendant's youthful age; the duration of his interrogation; the lateness of his confession; police requests of defendant's brother, mother and girlfriend to talk defendant into telling what he knew; the absence of family members during police interrogation; and finally the handcuffing of defendant during questioning.

The uncontradicted evidence showed that defendant was 18 years old and was of normal intelligence. Although as defendant asserts he was in custody for at least seven hours prior to his confession, he was not continuously interrogated during that time. He was questioned intermittently for brief periods. Significantly, a 4-5 hour break occurred immediately prior to his confession during which no questioning occurred at all by police. Furthermore, while Sergeant Russo did admit to asking defendant's brother if he "would go over and talk to [defendant] to find out what happened" and to telling defendant "that his mother and brother could talk with him, and he could say anything he wanted to with them," defendant never "confessed" to any member of his family. Additionally, defendant never testified that any of his family members asked him to tell what he knew, but only described his conversation with them as "just talk[ing] casually." The uncontradicted evidence also showed that defendant was not kept in isolation during custody but had access to his family members and girlfriend at all times, except for three or four questioning periods. Furthermore, defendant had been informed of his rights by Haddad.

■■ Additionally, certain contradicted evidence was before the trial court. While defendant's witnesses testified that defendant had been handcuffed and that his confession occurred at approximately 3 a.m., the State's witnesses testified that defendant had not been handcuffed and that his confession occurred at approximately 1 a.m. Furthermore, while defendant's brother testified that Russo requested him to talk to defendant at

approximately 10 p.m., Russo testified the request was made at 8 p.m. Finally, defendant denied making any confession as recounted by the State's witnesses, but testified to merely nodding his head to McCabe's alleged statement, "* * * just shake your head and we'll let you go." When we consider as we must all of the evidence surrounding the making of defendant's confession (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508), including the contradicted evidence, best resolved by the trial court (*People v. Medina* (1978), 71 Ill. 2d 254, 375 N.E.2d 78), which is in the best position to determine the credibility of the witnesses and the weight to be accorded their testimony (*People v. Lester* (1981), 102 Ill. App. 3d 761, 430 N.E.2d 358), we cannot say that the trial court's decision that defendant's confession was voluntary was against the manifest weight of the evidence. Therefore, the trial court properly denied defendant's motion to suppress his confession.

Defendant next asserts that he established a *prima facie* case, unrebutted by the prosecution that he was denied his State constitutional right to be tried by "an impartial jury of the county" in which the crime was allegedly committed (Ill. Const. 1970, art. I, §8) by the prosecution's use of its peremptory challenges to exclude black persons from the jury. Under *Swain v. Alabama* (1964), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, decided on equal protection grounds, the motives of the prosecution in exercising peremptory challenges are not subject to examination absent a showing of a systematic pattern over time of excluding blacks from jury service. A similar position has been taken by the Illinois Supreme Court in *People v. Harris* (1959), 17 Ill. 2d 446, 161 N.E.2d 809, *cert. denied* (1960), 362 U.S. 928, 4 L. Ed. 2d 747, 80 S. Ct. 755; *cf. People v. King* (1973), 54 Ill. 2d 291, 296 N.E.2d 731; *People v. Powell* (1973), 53 Ill. 2d 465, 292 N.E.2d 409; *People v. Heard* (1971), 48 Ill. 2d 356, 270 N.E.2d 18; *People v. Butler* (1970), 46 Ill. 2d 162, 263 N.E.2d 89.

The defendant cites *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890, in which the California Supreme Court considered whether the prosecution's use of peremptory challenges violated defendant's right to an impartial jury under the California Constitution. Defendant urges this court to adopt the rationale enunciated in that case. In *Wheeler* the defendants were black and the victim was white. The prosecution peremptorily challenged all the black veniremen. The California Supreme Court reversed the defendants' convictions holding that when a defendant has made a *prima facie* case that the prosecution has excluded veniremen on the basis of their race, the prosecution has the burden to show that its exclusion of the jurors was based on other grounds. Under *Wheeler* the defendant must meet the following requirements to establish a *prima facie* case: (1) he must make

as complete a record as feasible; (2) he must establish that the excluded persons are members of a cognizable group; and (3) he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias. 22 Cal. 3d 258, 280, 583 P.2d 748, 764, 148 Cal. Rptr. 890, 905.

The Illinois Supreme Court has recently declined to consider the issue of whether it should adopt the *Wheeler* standard, where the defendant did not challenge the racial composition of the jury until all the jurors had been sworn and where the defendant failed to make a record showing that the veniremen who were peremptorily challenged by the prosecution were black. (*People v. Gaines* (1981), 88 Ill. 2d 342, 359, 430 N.E.2d 1046, 1054.) As our supreme court pointed out, such a showing is required even under *Wheeler*.

■■ Similarly, a consideration of defendant's challenge here to the composition of his jury cannot be made in the absence of an adequate record of the *voir dire*. For without an adequate record there is nothing to review. In the instant case the proceedings in which jury selection occurred have not been preserved. In lieu of a record of those proceedings, defendant urges us to consider the facts recited in his written motion for a mistrial made immediately after jury selection, supplemented by his oral representations before the trial court. However, Supreme Court Rules 323(c) and (d) which set out the necessary procedure for a bystander's report of proceedings or an agreed statement of facts are specifically applicable to criminal appeals. (Ill. Rev. Stat. 1979, ch. 110A, pars. 323(c), 323(d) and 612(c).) We cannot accept statements of counsel in lieu of a duly prepared and authenticated report of proceedings. (*People v. Poliquin* (1981), 97 Ill. App. 3d 122, 421 N.E.2d 1362.) The trial court did note when entertaining defendant's motion for a mistrial that no black persons were among the first twelve members of the jury. (One black person did serve on the jury as second alternate.) The court also stated that "perhaps four blacks were excluded on the peremptory challenges by the State." However, without a record of the *voir dire* we cannot review the questions posed to and the responses of the veniremen. Thus, we cannot preclude the possibility that the prosecutor found those black persons excused from the jury were unqualified for reasons wholly unrelated to race. *People v. Bracey* (1981), 93 Ill. App. 3d 864, 417 N.E.2d 1029.

Defendant next asserts that the testimony of Officer McCabe regarding his interrogation of John Coleman and the subsequent location of the murder weapon violated defendant's sixth amendment rights to confront the witnesses against him.

The substance of McCabe's testimony to which defendant objected at trial was that on May 1, 1976, he had talked with Coleman and defendant at Area 2 headquarters. Subsequently, Coleman, Coleman's

father, another investigator and McCabe went to a residence at 86th and Muskegon and retrieved a gun, later identified as the murder weapon. After returning to Area 2 headquarters McCabe again talked with Coleman. After taking Coleman's statement McCabe talked with defendant who then confessed to shooting Beckwith and Jones.

Defendant does not contend that he was unable to confront McCabe, but rather that he was unable to confront Coleman who implicitly testified against defendant through McCabe's testimony.

■■ The sixth amendment right of an accused to confront witnesses against him is a fundamental right, obligatory on the States by the fourteenth amendment. (*Pointer v. Texas* (1965), 380 U.S. 400, 403, 13 L. Ed. 2d 923, 926, 85 S. Ct. 1065, 1067.) The reason for the right to confrontation is to afford a criminal defendant the opportunity to test the truth of his accuser's assertions. (*People v. Bryant* (1976), 36 Ill. App. 3d 298, 343 N.E.2d 617.) Therefore, determination of whether a defendant's sixth amendment right to confrontation has been violated depends upon whether defendant has been deprived of the right to test the truth of direct testimony. (*People v. Bryant*; *People v. Tennant* (1976), 65 Ill. 2d 401, 358 N.E.2d 1116, *cert. denied* (1977), 431 U.S. 918, 53 L. Ed. 2d 229, 97 S. Ct. 2184; see also *Pointer v. Texas*; *Douglas v. Alabama* (1965), 380 U.S. 415, 13 L. Ed. 2d 934, 85 S. Ct. 1074; *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) However, it has been held that an accused's right to confrontation is not violated by the testimony of a police officer that he effected an arrest subsequent to the confession of an accomplice when the statements testified to did not expressly or directly implicate the defendant. (*People v. Williams* (1977), 52 Ill. App. 3d 81, 367 N.E.2d 167.) There is nothing in the testimony of Investigator McCabe which would directly or expressly implicate defendant nor did McCabe testify to the substance of any statement made by Coleman. He testified to the fact that he talked with defendant "* * * after we took the written statement [presumably of Coleman]." Defendant's objection to the latter statement was sustained. As the *Williams* court noted "* * * the jury could reasonably infer from the testimony in question that [Coleman] implicated defendant * * * but that inference is not so immediate to mandate reversal * * *." (52 Ill. App. 3d 81, 87, 367 N.E.2d 167, 172.) Here, as in *Williams*, McCabe's testimony was confined to his physical activities and to the bare occurrence of his conversation with Coleman, and hence was not improper.

Defendant next contends that the trial court committed reversible error by refusing to submit either of two jury instructions tendered by him which were not Illinois Pattern Jury Instructions. Defendant argues that these instructions were necessary to protect him from the "hearsay" which

had been introduced into the record by McCabe's testimony with reference to his conversations with Coleman, the testimony we have just discussed, and by defendant's testimony that McCabe told him that Coleman "had made a statement on [him]."

■■ The sole function of instructions is to convey the correct principles of law applicable to the evidence submitted to the jury, so that the jury may apply the proper legal principles to the facts gleaned and arrive at a correct conclusion according to the law and the evidence. (*People v. Dordies* (1978), 60 Ill. App. 3d 621, 377 N.E.2d 245.) The decision whether to give a tendered non-IPI instruction is always within the discretion of the trial court. Instructions should not be given, however, if they do not accurately state the law (*People v. Farris* (1980), 82 Ill. App. 3d 147, 402 N.E.2d 629) or if they are misleading or confusing. (*People v. Dordies*.) The two non-IPI instructions which defendant asserts were required to protect him from the prejudicial effects of hearsay testimony read as follows:

"(3) You are instructed that you should not consider as evidence any testimony concerning either statements or actions of another party who is not on trial before this court.

(4) Statements or actions of another person made against the defendant outside of his presence should not be considered by you as evidence in this trial."

These tendered instructions do not accurately reflect the law relative to hearsay testimony. As stated by the supreme court in *People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741, " '[h]earsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' [Citation.]" Defendant's tendered instructions imply that any statement or conversation concerning another or made outside of the defendant's presence is inadmissible. Such is not the law. (*People v. Carpenter*.) As neither of these two instructions tendered by defendant accurately stated the law, they were properly rejected by the trial court.

Defendant next asserts that the trial court erred by denying the jury's request for transcripts outside the presence of counsel. Although the trial court did make the jury's request and the resulting denial a matter of record, defendant asserts additional error in that the record is silent as to whether defense counsel was present at that time. The State contends that defendant has waived this issue by failing to object to the denial of the transcript request when that denial was made a part of the record and by failing to raise the issue in his written post-trial motion. The State also correctly points out that defendant has not included his post-trial motion in the appellate record before this court.

■■ It has been held that the failure to object to the court's denial of the jury's request for trial transcripts and the failure to raise such objection in one's post-trial motion constitutes a waiver of the issue. (*People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511.) We agree with the State's argument. The party who brings a cause to the reviewing court must present a record which fairly and fully presents all matters necessary and material for a resolution of the issues presented. (*People v. Bonner* (1979), 68 Ill. App. 3d 424, 386 N.E.2d 366.) On review the reviewing court is restricted in its examination of the record as it is. (*People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944, *cert. denied* (1979), 442 U.S. 931, 61 L. Ed. 2d 299, 99 S. Ct. 2862.) In the record before us there is neither an objection by defendant to the court's denial of the jury request at the time the matter was made of record, nor a written post-trial motion in which the issue has been raised by defendant. Accordingly, on the record before us we conclude defendant has waived this issue.

■■ Lastly, defendant contends that his conviction should be reversed because the evidence was insufficient to sustain his conviction. He argues that the occurrence and voluntary nature of his confession were controverted, minimal physical evidence linked him to the crime and that his alibi was unrebutted. Although we agree with defendant that minimal physical evidence directly linked him to the crime, defendant's contention is undermined by the testimony of the police investigator and the assistant State's Attorney that defendant confessed to the killing. The jury was free to choose between their testimony and his denial (*People v. Tennant* (1976), 65 Ill. 2d 401, 358 N.E.2d 1116, *cert. denied* (1977), 431 U.S. 918, 53 L. Ed. 2d 229, 97 S. Ct. 2184) and was under no obligation to believe defendant's alibi evidence. (*People v. Tennant*; *People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1.) Whether or not defendant was proved guilty beyond a reasonable doubt in this case is largely a matter of the credibility of the witnesses. A court of review will not substitute its judgment for that of the trier of fact on questions of witness credibility. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) Since there is evidence here which, if believed, overwhelmingly supports a finding of guilt, we will not substitute our judgment for that of the jury. *People v. McElroy* (1980), 81 Ill. App. 3d 1067, 401 N.E.2d 1069.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.